# In the United States Court of Federal Claims

SCIENCE AND TECHNOLOGY
CORPORATION,

                   *Plaintiff,*

v.

THE UNITED STATES,

                   *Defendant,*

and

ANALYTICAL MECHANICS
ASSOCIATES, INC.,

               *Defendant-Intervenor.*

No. 24-1394
(Filed: January 3, 2025)[1]

*Robert J. Symon*, Bradley Arant Boult Cummings LLP, Washington, D.C., for Plaintiff.

*Kelly Elizabeth Phipps*, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.

*Francis Eugene Purcell, Jr.*, Thompson Hine LLP, Washington, D.C., for Intervenor.

## OPINION AND ORDER

**LERNER,** *Judge*.

       In this post award bid protest, Plaintiff, Science and Technology Corporation ("STC" or "the Corporation"), challenges the National Aeronautics and Space Administration's ("NASA" or "the Agency") decision to award Intervenor, Analytical Mechanics Associates, Inc. ("AMA"), a contract for Aircraft and Spaceflight Systems Engineering Support Services ("ASSESS"). STC contends that the award should be set aside because the Agency unfairly adjusted its proposed price through a flawed cost realism analysis without seeking discussions or clarifications with STC. Plaintiff also claims that the Agency unreasonably evaluated Mission Suitability and Past Performance factors for both Offerors, and it conducted a flawed and incomplete best value trade-off analysis. These errors, STC alleges, prejudiced the Corporation.

---

[1]     This Opinion was filed on December 19, 2024, and the parties were afforded time to propose redactions. Opinion & Order, ECF No. 35. Plaintiff proposed unopposed redactions. ECF No. 38. Accordingly, the Court reissues this Opinion with the agreed upon redactions, which are noted with bracketed asterisks, e.g., [***].

Plaintiff's arguments are unavailing.  The Corporation fails to meet its burden to establish that the Agency acted arbitrarily or capriciously in its evaluation of STC's proposal.  Plaintiff did not provide NASA critical information that it needed to evaluate the proposal as the Solicitation required.  As explained below, the Agency acted reasonably.

Before the Court are the parties' Motions for Judgment on the Administrative Record. Pl.'s Mot. for J. on the Admin. R. (hereinafter "Pl.'s Mot."), ECF No. 25; Def.'s Cross-Mot. and Resp. for J. on the Admin. R. (hereinafter "Def.'s Mot."), ECF No. 27; Intervenor's Cross-Mot. and Resp. for J. on the Admin. R., ECF No. 26.  For the reasons below, STC's Motion for Judgment on the Administrative Record is **DENIED**.  Defendant's and Intervenor's cross-motions are **GRANTED**.

# I.    Background

On March 16, 2023, NASA issued a Request for Proposal ("RFP"), Solicitation No. 80ARC023R006, and supplemented it once on April 6, 2023.  Tab 18 at AR 1025; Tab 19 at AR 1333.  The RFP sought a small business contractor to provide engineering support services for its spaceflight systems and the development of aircraft and spaceflight technologies at NASA's Ames Research Center ("NASA Ames") in California.  Tab 10 at AR 401; Tab 11 at AR 423, 430–31; Tab 19 at AR 1481.  *See also* Def.'s Mot. Ex. 1 at 2–4.

The ASSESS contract is an amalgamation of two prior contracts for support services. NASA Ames previously contracted with STC for the Aeronautics and Exploration Mission Modeling and Simulation ("AEMMS") award.  Tab 11 at AR 422.  The Agency separately awarded AMA the Entry Systems Research and Technology Development ("ESTRAD") contract.  *Id.*  NASA decided to combine these two contracts into one, with a sole contractor.  *Id.* at AR 466.  The Agency estimated the ASSESS contract is worth $92.7 million.  Tab 11 at AR 423.  The Source Evaluation Board ("SEB") would first assess the proposals and provide expert analysis.  Tab 19 at 1468–69.  The SEB would then present its findings to the Source Selection Authority ("SSA"), who would make the final award decision.  *Id.*

## A.    The Solicitation

Federal Acquisition Regulation ("FAR") subpart 15.3 and NASA FAR Supplement ("NFS") subpart 1815.3 governed the Solicitation.  Tab 33 at AR 2567.  The ASSESS contract includes a firm fixed price ("FFP") term for contract management as well as an indefinite delivery indefinite quantity ("IDIQ") component for technical services in ten specific discipline areas to be performed under Task Orders issued under the contract.  Tab 19a at 1334.  *See also* Tab 19b at 1508–09 (listing the ten IDIQ technical discipline requirements).

The ASSESS Solicitation informed bidders that NASA Ames did not intend to hold discussions unless it later decided they were necessary.  Tab 19 at AR 1468.  *See also* Tab 33 at AR 2568.  Offerors were directed to follow the preparation instructions for their proposals, and the proposals were evaluated "on the basis of the material presented and substantiated in the Offeror's proposal and not on the basis of what may be implied."  Tab 19 at AR 1469.  Vague

statements in proposals would be "interpreted as a lack of understanding on the part of the Offeror and/or inability to demonstrate adequate qualifications and resources." *Id.*

NASA Ames weighed three contract factors to determine which proposal represented the best value for the Agency. *Id.* at AR 1468; Tab 18a at AR 1164–65. The three evaluation factors were: Mission Suitability, Past Performance, and Cost/Price. Tab 19 at AR 1468 (citing factors described at NFS 1815.304-70(b)-(d)). Mission Suitability outweighed Past Performance, and the combination of the two factors was "significantly more important" than Cost/Price—the least important factor in the trade-off analysis. *Id.* at AR 1479. Still, the Solicitation instructed offerors to include their best terms for price. *Id.* at AR 1468.

## 1.    Mission Suitability

Mission Suitability conveys "the merit or excellence of the proposed approach to performing the requirements." *Id.* at AR 1444. *See generally* NFS 1815.304-70(b). Under Mission Suitability, the Agency would evaluate each proposal's approach to performing the contract requirements. *Id.* at AR 1470. NASA Ames' rubric for this factor contained two subfactors: management approach (subfactor A) and technical understanding (subfactor B). *Id.* at AR 1444–48, 1470. Management approach would assess an offeror's plan to address the performance work statement ("PWS") requirements. *Id.* at AR 1444–47. The SEB would evaluate each proposal for organizational structure and partnership approach as well as plans for staffing, compensation, data management, phase-in, and fostering innovation. *Id.* Technical understanding would require each offeror to reply to three sample Task Orders for work product to support a hypothetical mission to land a spacecraft carrying scientific equipment on Venus. *Id.* at AR 1447–53. NASA Ames appraised each offeror based on their written responses. *Id.* at AR 1443.

Mission Suitability was numerically scored on a 1,000-point scale. *Id.* at AR 1470, 1472. The RFP allocated 550 points to management approach, and 450 points went towards technical understanding. *Id.* at AR 1472. NASA Ames evaluated each subfactor for strengths and weaknesses and then assigned each subfactor an adjectival and numerical rating. *Id.* at AR 1470. The adjectival ratings are explained in the table below:

| Adjectival Rating | Description | Percentile Rating |
|---|---|---|
| Excellent | A comprehensive and thorough proposal of exceptional merit with one or more significant strengths. No deficiency or significant weaknesses exist. | 91–100 |
| Very Good | A proposal having no deficiency and which demonstrates over-all competence. One or more significant strengths have been found, and strengths outbalance weaknesses that exist. | 71–90 |
| Good | A proposal having no deficiency and which shows a reasonably sound response. There may be strengths or weaknesses, or both. As a whole, weaknesses not off-set by strengths do not significantly detract from the offeror's response. | 51–70 |
| Fair | A proposal having no deficiency and which has one or more weaknesses. Weaknesses outbalance any strengths. | 31–50 |
| Poor | A proposal that has one or more deficiencies or significant weaknesses that demonstrate a lack of overall competence or would require a major proposal revision to correct. | 0–30 |

*Id.* at AR 1471. The Solicitation defined weakness as "a flaw in the proposal that increases the risk of unsuccessful contract performance." *Id.* To receive one of the two highest adjectival ratings, a proposal needed significant strengths that "greatly enhance[d] the potential for successful contract performance." *Id.* at AR 1471–72.

The RFP instructed that "[t]he compatibility between the proposed technical and management approach and the overall resources proposed to accomplish the work" was an important consideration in the evaluation of the Mission Suitability factor. *Id.* at AR 1472. If the SEB determined that a proposal did not adequately demonstrate that an offeror could perform the work with the resources provided, the Board could find that the discrepancy "warrant[ed] a probable cost adjustment." *Id.* at AR 1444, 1472, 1478. As the Solicitation stated: "[i]ntegration between mission suitability findings and probable cost adjustments is critical to performing cost realism." *Id.* at AR 1444, 1472.

## 2. Past Performance

Each offeror was required to provide references for three recent past contract performances both for itself and any of its subcontractors. *Id.* at AR 1454, 1476. The references needed to be from contracts meeting a specified minimum contract value that illustrated an offeror's experience delivering services and products similar in content and size to the ASSESS contract. *Id.* at AR 1454, 1475. Each reference needed to include a detailed description of the

work the offeror performed as well as a "comparison to the requirements in each PWS section to be performed under this effort." *Id.* at AR 1455.

NASA Ames evaluated each reference's relevance to the ASSESS contract requirements as well as the quality of the offeror's performance. Under FAR Part 15, the Agency determined relevancy of past contracts based on their size, content, and complexity. *Id.* at AR 1474–75. Defendant then assigned an overall confidence score of very high, high, moderate, low, very low, or neutral. *Id.* at AR 1475–77.

### 3. Cost/Price

The Cost/Price factor was evaluated on reasonableness and, if necessary, the cost realism of proposed costs in a proposal. NFS 1815.403-70(c). The Solicitation advised potential offerors that it would determine the probable cost of each proposal by evaluating the proposal's realism in accordance with FAR 15.305(a)(1) and NFS 1815.305(a)(1). Tab 19 at AR 1477. NASA Ames explained that cost realism means the costs in a proposal are realistic for the work performed and consistent with the elements of the offeror's technical proposal. *Id.* (citing FAR 2.101(b)). The Solicitation specified that each offeror must "explain in detail all pricing and estimating techniques" in its proposal. *Id.* at AR 1457. Offerors needed to "[d]isclose the basis of all projections, rates, ratios, percentages, and factors in enough detail to facilitate the [SEB's] understanding and ability to mathematically verify the results of these estimating tools." *Id.* at AR 1458.

NASA Ames instructed that it would "determine the Probable Cost of each Offeror's proposal by evaluating the realism of each Offeror's proposed cost to ensure the Offeror understands the magnitude and complexity of the effort." *Id.* at AR 1477. In conducting a cost realism analysis, the Agency would consider whether an offeror's proposed costs "indicate[d] a clear understanding of solicitation requirements" and "demonstrate[ed] that the Offeror [would] be able to perform the work." *Id.* at AR 1478. The Agency noted that it may compare proposed costs and prices to historical data as well as to other proposed costs/price given in response to the RFP. *Id.*

### B. Offerors' Proposals

Both STC and AMA timely submitted proposals for the ASSESS contract on May 11, 2023. *See generally* Tab 21 (AMA's proposal); Tab 22 (STC's proposal). No other offerors applied for the contract. Tab 24 at 2217. The SEB, which provided expert analysis, evaluated the proposals. *See* Tab 6 at AR 289–91; Tab 25 AR 2280–81 (detailing SEB composition). The SEB assessed each proposal under the three evaluation factors. *See id.*

### 1. AMA Performed Better than STC in Mission Suitability.

AMA and STC received the following evaluation for the Mission Suitability subfactors:

|  | AMA | | STC | |
|---|---|---|---|---|
|  | *Management Approach* (550 total) | *Technical Understanding* (450 total) | *Management Approach* (550 total) | *Technical Understanding* (450 total) |
| *Numerical Scores* | 379.5 | 355.5 | 286 | 229.5 |
| *Percent* | 69% | 79% | 52% | 51% |
| *Adjectival Scores* | Good | Very Good | Good | Good |
| *Significant Strengths* | 0 | 1 | 0 | 0 |
| *Strengths* | 5 | 3 | 1 | 1 |
| *Weaknesses* | 0 | 1 | 1 | 3 |

Tab 25 at AR 2314, 2341, 2342. Under the management approach subfactor, the SEB found AMA had no weaknesses or deficiencies—which proved significant in the decision to award AMA the contract. *Id.* at AR 2295; Tab 33 at AR 2577. The SEB found AMA had one weakness under technical understanding because their proposed approach did not address a requirement for predicting buffet onset—a noticeable vibration or oscillation of aircraft moving near the speed of sound. Tab 25 at AR 2328–29.

In contrast, the SEB found several weaknesses in STC's proposal under the management approach and technical approach prongs. Tab 25 at AR 2306, 2330–31. It wrote:

> The Offeror[']s proposal did not describe the proposed organizational structure that clearly demonstrates how the Offeror will perform these programmatic and technical contractual requirements, nor did it provide a detailed explanation of how the [O]fferor will coordinate all entities/personnel responsible for accomplishing the following requirements . . . : Safety and Health, Records Management, Secure Handling and Protection of Government Controlled Contractor Generated Data, IT Security, Installation-Accountable Government Property.

*Id.* at 2306. *See also id.* at AR 2310–13. The SEB noted that since STC did not address these requirements in their proposal, it would "likely lead to critical gaps in the required contract management functions, potentially increasing the risk of unsuccessful contract performance." *Id.* at AR 2306.

Under the technical approach subfactor, the SEB found STC had one strength. Unlike AMA, STC had an effective approach to buffet mitigation. *Id.* at AR 2330; Tab 33 at AR 2577. However, Plaintiff had three weaknesses in database generation, arc jet test planning, and risk mitigation. Tab 25 at AR 2333–38. These weaknesses were assigned, in part, because STC omitted important steps in its analysis and did not engage in adequate discussion of its approach to the Task Orders. *Id.* at AR 2330–31. In total, AMA received 735 points under Mission Suitability. *Id.* at AR 2342. Plaintiff received 515.5 points. *Id.*

### 2.     AMA Received a Slightly Higher Rating in Past Performance.

Under the Past Performance factor, AMA received a confidence rating of "very high" based on three previous contracts with different NASA research centers where it was the primary contractor. *Id.* at AR 2346, 2349. Very high was the highest confidence factor. *Id.* at AR 2345. The table below shows how the SSA and the SEB evaluated AMA:

| Contract | Value | Period | Level of Pertinence (Size, Content, & Complexity) | | | | | Overall Level of Relevance | Quality of Performance |
|---|---|---|---|---|---|---|---|---|---|
| | | | *Very Highly Relevant* | *Highly Relevant* | *Relevant* | *Slightly Relevant* | *Not Relevant* | | |
| ESTRAD | ☒ | ☒ | 4 | 4 | 2 | 0 | 1 | Very Highly Pertinent | Exceptional |
| AMA Contract 2 | ☒ | ☒ | 2 | 8 | 1 | 0 | 0 | Very Highly Pertinent | Exceptional |
| AMA Contract 3 | ☒ | ☒ | 0 | 1 | 2 | 1 | 7 | Pertinent | Very Effective |

Tab 26a at AR 2390. AMA received an overall "very high" confidence rating. *Id.*

The evaluators found two of AMA's contracts were cumulatively "very highly pertinent." *Id.* This included its work on the ESTRAD contract, which was one of the two predecessor contracts to the ASSESS award. *Id.* at AR 2391–99. Defendant decided that AMA's past performance was of "exceptional merit" and "indicate[d] exemplary performance in a timely, efficient, and economical manner and very minor (if any) problems with no adverse effect on overall performance." *Id.* at AR 2411. *See also* Tab 25 at AR 2348.

STC received a confidence rating of "high" for its three past experiences as the main contractor for NASA research centers. Tab 26b at AR 2434. Two of its contracts were found to be "pertinent," and it performed "Effective" on one and with "Exceptional Merit" on the other. Tab 25 at AR 2355. Its third contract was found "highly pertinent," and it performed with "Exceptional Merit." *Id.* The table below illustrates how NASA Ames ranked STC's past performances:

| Contract | Value | Period | Level of Pertinence (Size, Content, & Complexity) | | | | | Overall Level of Relevance | Quality of Performance |
|---|---|---|---|---|---|---|---|---|---|
| | | | *Very Highly Relevant* | *Highly Relevant* | *Relevant* | *Slightly Relevant* | *Not Relevant* | | |
| AEMMS | ☒ | ☒ | 2 | 2 | 5 | 2 | 0 | Highly Pertinent | Exceptional |
| STC Contract 2 | ☒ | ☒ | 0 | 1 | 4 | 3 | 3 | Pertinent | Effective |
| STC Contract 3 | ☒ | ☒ | 1 | 1 | 2 | 4 | 3 | Pertinent | Exceptional |

Tab 26b at AR 2412.  STC received an overall "high" confidence rating.  *Id.*

The SEB assigned a "high" confidence level "because the past performance information evaluated by the SEB ranged from highly pertinent to pertinent to this acquisition and demonstrated performance ranging from exceptional to effective."  Tab 25 at AR 2356.  Notably, STC's AEMMS contract, which was also a precursor to the ASSESS award, was ranked as "highly pertinent."  Tab 26b at AR 2412.  Defendant determined that STC's proposal demonstrated "effective performance" but noted that it had "minor problems that had little identifiable effect on overall performance."  *Id.* at AR 2434.  Accordingly, Defendant found that AMA slightly exceeded STC in the past performance category.  Tab 33 at 2578.

### 3.    Cost/Price Evaluation

Finally, the SEB evaluated the two proposals under the Cost/Price factor.  The SEB conducted a cost realism analysis for each proposal.  *See generally* Tab 24 at AR 2217–36.  The table below summarizes the adjustments made by the Agency:

| | Initial Price ($) | | Probable Costs ($) | | Probable Cost Adjustments ($) | |
|---|---|---|---|---|---|---|
| | *AMA* | *STC* | *AMA* | *STC* | *AMA* | *STC* |
| Phase-in | - | - | - | - | - | - |
| Contract Management (Year 1) | 909,270 | 572,284 | 909,270 | 572,284 | - | - |
| Contract Management (Year 2) | 934,343 | 586,572 | 934,343 | 586,572 | - | - |
| Contract Management (Year 3) | 960,359 | 597,455 | 960,359 | 597,455 | - | - |
| Contract Management (Year 4) | 988,010 | 618,300 | 998,010 | 618,300 | - | - |
| Contract Management (Year 5) | 1,016,587 | 640,687 | 1,016,587 | 640,687 | - | - |
| IDIQ Task Orders | 84,096,702 | 79,690,923 | 89,496,935 | 87,126,014 | 5,400,233 | 7,435,091 |
| FAR 52.217-8 FFP CLINs | 508,294 | 320,344 | 508,294 | 320,344 | - | - |
| FAR 52.217-8 CPFF CLIN | 8,409,670 | 7,969,092 | 8,949,694 | 8,712,601 | 540,024 | 743,509 |
| Grand Total | 97,823,657 | 90,995,657 | 103,763,492 | 99,174,257 | 5,940,257 | 8,176,600 |

*Id.* at AR 2218.  In accordance with the RFP, Defendant did not perform a price realism analysis on the fixed costs in the contract.  *Id.*  Neither Offeror proposed costs for phase-in.  *Id.*

8

The Agency made upward probable adjustments to both AMA's and STC's proposals. *Id. See also id.* at AR 2223–30. Both were considered incumbent contractors because of their work with the ESTRAD and AEMMS awards, so both received labor rate adjustments based on historical data from their incumbency. *Id.* at AR 2224–25; Tab 25 at 2372–73. However, this was AMA's only adjustment. *See* Tab 24 at AR 2224–30.

In comparison, STC received several upward adjustments to its proposed Division 3 Overhead, Business Segment 1 G&A Rate, and Tier 1 G&A Rate. *Id.* The Agency made many of its adjustments to STC's costs because it failed to provide information or documentation that supported its estimates. *See, e.g.*, Tab 24 at AR 2227 ("There is no adequate supporting documentation to accept the increased business base at face value."). AMA provided this information. *See* Tab 21d at AR 1787–93.

The Agency acknowledged that STC's proposal was based on its 2022 and 2023 preliminary forecasted rates submitted to the Defense Contract Audit Agency ("DCAA"). Tab 24 at AR 2225. As STC explained in its proposal, at the time of submission, its 2022 rates had not been finalized by DCAA. *See e.g.*, Tab 22d at AR 2106–08. But STC did not provide the preliminary forecasted rates to the Agency. *See, e.g.*, Pl.'s Mot. at 10.

### a. Division 3 Overhead Rate Adjustment

NASA Ames flagged two elements of STC's overhead pool computation. First, STC forecasted "zero costs" for "Taxes, State income, & Franchise costs." Tab 24 at AR 2225–26. This did not align with NASA's historical data on STC from 2019 through 2021. *Id.* Thus, Defendant estimated STC's probable cost based on a simple average of its historical costs from the three years of available data. Tab 24 at AR 2226. NASA Ames saw this as a conservative approach given that STC's costs in 2021 were almost double what they were in 2019 and 2020. *Id.*

Second, the Agency questioned STC's sector allocation cost element. *Id.*; Tab 22d at AR 2107 (mentioning that STC had another contract award that would affect its base rate). STC's forecasted base number considered another Division 3 contract that the entity would perform. *Id.* The base figure consisted of an escalated base plus amounts to represent the base of the other contract. Tab 24 at AR 2226. However, STC provided "insufficient supporting documentation to accept the increased forecasted amount of the application base." *Id.* Defendant noted that historically STC "allocated amounts ranging from $[******] to $[******] per year" but its forecast "allocation was significantly reduced ranging in amounts from $[*****] to $[*****] per year." *Id.* AMA's forecasted base number also considered other contracts, but unlike STC, AMA provided NASA Ames with more detail about how AMA's other awards would affect its anticipated base rate. *Compare* Tab 22d at AR 2107 *with* Tab 21d at AR 1787–88. Accordingly, Defendant increased STC's predicted figure using a simple three-year average of the historical data. Tab 24 at AR 2226

### b.  Business Segment 1 G&A Adjustment

NASA Ames changed STC's Business Segment 1 G&A Adjustment.  Again, the SEB acknowledged that STC's calculations were based on data it submitted to DCAA, which included adjustments for STC's work on another Division 3 contract.  *Id.* at AR 2227.  STC predicted "lower than historical rates due to (i) additional base labor dollars projected for [the segment]" and (ii) reduced overhead costs if STC won a separate contract.  *Id.*  The anticipated costs in the proposal for the 2024-2029 period were lower than STC's expenses in the available historical data.  Tab 22d at AR 2121.

However, Defendant found that "[t]he proposed rates [were] volatile and outyear projects [were] based on a robust unjustified increase in business base assumptions."  Tab 24 at AR 2227.  The SEB thought STC's assumption that its base would double by 2029 was unlikely.  *Id.*  Given this evaluation, the Agency believed it was unlikely that STC's pool costs would substantially decrease as Plaintiff predicted.  *Id.*  NASA Ames found that STC provided no "adequate supporting documentation to accept the increased business base at face value."  *Id.*

The Agency specified that it adjusted STC's pool costs for multiple categories: indirect labor, bid and proposal, payroll additives and fringe benefits, travel, and existing business allocation base.  *Id.* at AR 2228.  Defendant found that STC's forecasted indirect labor "was essentially cut in half while at the same time the business base is dramatically increasing.  This is not realistic."  *Id.*  After the Agency's probable cost adjustment, it found forecasted rates were not in alignment with historical information STC provided, so the Agency modestly increased the resulting number.  *Id.*  Defendant further noted STC's travel costs appeared unrealistic given pre-pandemic costs.  *Id.* at AR 2229.  STC proposed negative costs for its Bid and Proposal prong without explaining why negative costs were acceptable in its pooled costs.  *Id.*

### c.  Tier 1 G&A Adjustment

Defendant next turned to STC's estimate for Tier 1 G&A Rates.  The Agency repeated its understanding that STC's figures were based on estimated costs from the DCAA.  *Id.* at AR 2229.  The SEB again found STC's "proposed rates [were] volatile and outyear projects [were] based on a robust unjustified increase in business base assumptions."  *Id.*  Plaintiff forecasted rates between [**]% and [***]%, which the Board determined were not adequately supported by the documentation in its application.  *Id.*  Accordingly, the SEB adjusted STC's payroll service center, postage and freight, and travel costs.  *Id.* at AR 2230.  STC failed to explain in its proposal why it forecasted no cost for its payroll service center or for postage and freight—both of which were significant costs in 2019.  *Id.*  Additionally, the Agency repeated its concerns with STC's travel estimates and its business base allocation.  *Id.*

### 4.    SSA Review

After its evaluation, the SEB identified potential discussion questions.  *Id.* at AR 2231.  The SEB noted no questions about AMA.  *Id.*  In contrast, the SEB listed ten potential discussion questions for STC, which were largely based on the Company's failure to explain many of its

forecasted costs. *Id.* at AR 2231–32. In total, NASA Ames increased AMA's proposed price by $5.9 million and STC's by $8.2 million. *Id.* at AR 2223–24. AMA's adjustments were solely based on its historical incumbent labor rates. *Id.*; Tab 25 at 2370.

The Agency estimated that AMA's proposal would cost $103,763,492. Tab 25 at 2389. STC estimated its proposal would cost $99,174,257—a $4,589,235 difference. *Id.* The table below summarizes the evaluation of AMA and STC:

| | *Mission Suitability Subfactors* | | | | |
|---|---|---|---|---|---|
| | **Management Approach (550 points)** | **Adjectival Rating (550 points)** | **Mission Suitability (1,000 points)** | **Past Performance Level of Confidence** | **Probable Cost/Price** |
| **AMA** | Good 379.5 | Very Good 355.5 | 735 | Very High | $103,763,492 |
| **STC** | Good 286 | Good 229.5 | 515.5 | High | $99,174,257 |

*Id.* at 2389. After the Agency's adjustments, the two Offerors' Cost/Price were close, but their scores in Mission Suitability differed significantly. *Id.*

Once the SEB completed its evaluation of the two proposals, it met with the SSA on March 27, 2024. Tab 33 at AR 2567. The SSA ultimately chose which offer to accept. *See* Tab 6 at AR 289 (explaining that SSAs make selection decisions for research centers). The SEB presented its conclusions and described why STC received lower ratings for both Mission Suitability and Past Performance. Tab 33 at 2571–75. The SSA found the Mission Suitability scores "were justified by the SEB's underlying findings" and the Past Performance evaluations "were detailed and clearly documented." *Id.* at AR 2575–76. The SEB's Cost/Price evaluation "made logical and sound cost adjustments." *Id.* at AR 2576. The SSA determined there was "nothing to be gained by . . . conducting subsequent discussions, given there was sufficient data to make a reasoned source selection." *Id.* The SSA awarded the ASSESS contract to AMA because its proposal represented the best value for the Government. *Id.*

As specified in the Solicitation, the SSA noted Mission Suitability was more important than Past Performance, which in turn was more important than Cost/Price. *Id.* Together, Mission Suitability and Past Performance significantly outweighed Cost/Price. *Id.* AMA scored higher than STC in the Mission Suitability factor overall and in both subfactors. *Id.* "[T]he AMA proposal offered a substantial discernable advantage over the STC proposal." *Id.* at AR 2578. The SSA "considered the potential impact of each finding and its relevance to this procurement, against the selection criteria prescribed in the RFP." *Id.* at AR 2576. It also noted that AMA had significantly more strengths than STC under both subfactors. *Id.* at AR 2576–77.

The SSA found AMA had the better Past Performance scores; though, the two Offerors were very close. *Id.* at AR 2578. The SSA determined the difference in cost between the two proposals was fungible. *Id.* Both proposals received an upward probable cost adjustment, "with

AMA's probable cost/price being approximately only 5% higher than STC[']s." *Id.* STC's proposed price was only "marginally lower." *Id.* The SSA expressed confidence in the probable cost adjustments and found "the STC proposal not to be a notable advantage to the Government." *Id.* In sum, the AMA proposal still represented the best value to the government even though it had a slightly higher probable cost because of its "substantial Mission Suitability advantages . . . combined with its Very High Level of Confidence rating for Past Performance." *Id.*

### C.    Initial Contract Award and Government Accountability Office Protest

On May 6, 2024, NASA Ames informed STC that it planned to award AMA the contract. Tab 35 at AR 2581. The Agency finalized its plans three days later. Tab 35 at AR 2581. STC received a debriefing on May 15, 2024. Tabs 37, 38. During the meeting, STC's representatives did not ask any questions. Tab 38 at 2667.

On May 20, 2024, STC protested the award at the Government Accountability Office ("GAO"). Tab 41 at AR 2673. The GAO denied STC's protest on August 23, 2024. Tab 51. According to the GAO, NASA Ames did not unreasonably evaluate the proposals under Mission Suitability or Past Performance. *Id.* at AR 4834–43. Nor were its probable cost adjustments improper or its best value trade-off unreasonable. *Id.* at 4844–45. Unsatisfied with the GAO's conclusion, Plaintiff filed its Complaint here on September 9, 2024. ECF No. 1.

## II.    Jurisdiction

The Court of Federal Claims has jurisdiction over protests by interested parties who object to "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). The Court has the authority to "render judgment on an action by an interested party objecting . . . to a proposed award or the award of a contract." *Id.*; *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1380–81 (Fed. Cir. 2012).

The party invoking the Court's bid protest jurisdiction bears the burden of establishing the elements of standing and demonstrating that they are an interested party. *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009). Interested parties are "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001). A plaintiff must show that but for "the alleged error[s] in the procurement process," it had a "substantial chance" of winning the award. *Mission1st Grp., Inc. v. United States*, 144 Fed. Cl. 200, 209 (2019) (citing *Weeks Marine*, 575 F.3d at 1359). *See also Ernst & Young, LLP v. United States*, 136 Fed. Cl. 475, 500 (2018) (explaining that the test for prejudice in a standing analysis is more lenient than in actual causation).

STC submitted a proposal in response to NASA's RFP Solicitation for the ASSESS Contract, and it asserts that if not for Defendant's errors, the Corporation would have a substantial chance of receiving the award. Pl.'s Mot. at 8. The Court has jurisdiction over STC's claims.

## III.    Standard of Review

In bid protest cases, courts look to whether an agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  28 U.S.C. § 1491(b)(1) (adopting the standard of 5 U.S.C. § 706); *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013); *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005).  The arbitrary and capricious standard used in bid protests is "highly deferential." *Glenn Def. Marine*, 720 F.3d at 907 (quoting *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000)).

A protestor bears the burden to show by a preponderance of the evidence that an agency's decision was arbitrary and capricious.  *Crowley Gov't Servs., Inc. v. United States*, 158 Fed. Cl. 358, 366 (2022) (citation omitted).  The reviewing court must determine whether either (1) the procurement official's decision lacked a rational basis, or (2) the procurement procedure deviated from regular processes.  *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1285–86 (Fed. Cir. 2010) (quoting *Weeks Marine, Inc.*, at 575 F.3d at 1358).  For a rational basis claim, "the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Centech Grp., Inc. v. United* States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quotation omitted).  An offeror who seeks review on a procedure theory must also "show a clear and prejudicial violation of applicable statutes or regulation." *Id.* (quotation omitted).

The reviewing court must make factual findings from the record evidence as if it were conducting a trial on the record.  *Bannum*, 404 F.3d at 1353–54; *Day & Zimmerman Servs., a Div. of Day & Zimmerman, Inc. v. United States*, 38 Fed. Cl. 591, 597 (1997); RCFC Rule 52.1.  The correct interpretation of a solicitation is an issue of law.  *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1352 (Fed. Cir. 2004).  "Ultimately, if a Court finds an agency action is within its bounds, it is not for the Court to substitute its own judgment for that of the agency." *CeleraPro*, 168 Fed. Cl. at 425 (citing *Weeks Marine*, 575 F.3d at 1371).  Agencies may exercise discretion when determining which contract best suits the needs of the Government.  *Logistics Co. v. United States*, 163 Fed. Cl. 542, 553 (2022).

## IV.    Discussion

According to Plaintiff, the key issue in this case is NASA Ames' decision to upwardly adjust its projected costs without discussion or seeking clarifications.  Pl.'s Reply at 1, ECF No. 28.  STC asserts Defendant acted irrationally in evaluating its proposal and arbitrarily when it minimized the price differential between the two proposals.  *Id.*  In STC's view, the Agency's upward adjustments tipped the award to AMA, resulting in the Government paying a "nearly $5,000,000 price premium" for the ASSESS award.  *Id.*

STC's assertion that Defendant acted unreasonably is not correct.  The record shows that NASA Ames appropriately assessed each proposal with the information the Offerors provided and properly documented its evaluations.  *See generally* Tab 24 (SEB Evaluation); Tab 25 (Initial Findings Presented to SSA); Tab 33 (SSA Evaluation).  It concluded that AMA's superiority in the Mission Suitability and Past Performance factors outweighed STC's lower

13

price. Tab 33 at 2578. NASA Ames reasonably concluded that AMA's proposal was a better value for the Government. *See id.*

The following section will first address STC's contentions that the Agency erred in its probable cost adjustments. Then it will explore NASA Ames' decision not to hold discussions or seek clarifications. Finally, it will examine the Agency's evaluation of Mission Suitability and Past Performance as well as NASA Ames' best value trade off analysis.

**A. NASA Ames Did Not Irrationally Determine the Probable Cost of STC's Proposal.**

"It is well established that the contracting agencies have broad discretion regarding the nature and extent of a cost realism analysis, unless the agency commits itself to a particular methodology in a solicitation." *Mission1st Grp.*, 144 Fed. Cl. at 211 (internal quotations omitted). *See also Agile Def., Inc. v. United States*, 959 F.3d 1379, 1385–86 (Fed. Cir. 2020). Cost realism analysis is

> the process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal.

*Agile Def.*, 959 F.3d at 1384 (quoting FAR 15.404-1(d)(1)). In other words, the reviewing agency "asks if a cost estimate is too low." *DynCorp. Int'l, LLC v. United States*, 10 F.4th 1300, 1305 (Fed Cir. 2021).

When evaluating a cost realism analysis, "an agency need not perform the analysis with impeccable rigor to be rational." *Crowley Tech. Management, Inc. v. United States*, 123 Fed. Cl. 253, 260 (2015) (cleaned up) (quoting *Westech Intern., Inc. v. United States*, 79 Fed. Cl. 272, 286 (2007)). A cost realism analysis simply must reflect that an agency considered the information available. *Id.* Defendant did just that.

STC asserts that the Agency made multiple unreasonable probable cost adjustments to STC's proposal that did not consider its actual or historical submissions. Pl's Mot. at 8–9. From STC's perspective, NASA's analysis was tainted with impermissible "irrational assumptions" and "critical miscalculations." *Id.* (quoting *Crowley Tech. Management*, 123 Fed. Cl. at 260). It was allegedly unreasonable for the Agency to increase STC's cost by nine percent simply because the SEB deemed the pricing to be unlikely. Pl.'s Reply at 5. STC's umbrage extends to adjustments made to the Division 3 Overhead category, the Business Segment 1 G&A Pool Adjustment, and the Tier 1 G&A Adjustment.

NASA Ames altered several of STC's provisions that relied on data from 2022 or 2023, often because STC did not provide enough documentation. Pl.'s Mot. at 8–13, 15–16. STC used DCAA approved rates and separate unapproved forecasted rates when it assembled its bid for the ASSESS contract. *Id.* at 9; Tab 22d at AR 2106. NASA only had Plaintiff's historical costs

from 2019, 2020, and 2021. *See, e.g.*, Tab 24 at AR 2227 ("STC did not include historical data for the 2022 year because it was not yet finalized and submitted to DCAA at the time the proposal was prepared."); Tab 22d1 at AR 2120. So while STC used numbers from 2022 and 2023 in its calculations, it did not provide those numbers directly to NASA. Pl.'s Mot. at 10. Instead, STC argues NASA Ames "*should* have had access to STC's DCAA approved 2022 final indirect rate[s]," as well as its provisional 2023 figures. *Id.* Plaintiffs do not point to anything in the Administrative Record or any caselaw supporting this assertion. *See id.*

STC reiterated that its base calculation for the Division 3 Overhead and Business Segment 1 G&A Rate stemmed from "the increased volume and cost for this proposed effort . . . and another current contract in Division 3." Pl.'s Mot. at 11 (emphasis removed) (quoting Tab 22d at AR 2110); Pl.'s Mot. at 12–13. For that factor, NASA determined that STC's proposal did not provide "adequate supporting documentation to accept the increased business base at face value." Tab 24b at AR 2264. Plaintiff avers that this statement showed that the Agency made an "irrational assumption that [its] proposed business Base was unsupported" because STC's proposal, in its view, corroborated its calculations. Pl.'s Mot. at 11. Further, it argues, NASA should have been able to access the information STC relied on through the DCAA—or through discussions or clarifications. *Id.* at 14. STC had the burden to provide this information: the Solicitation instructed proposals would be evaluated "on the basis of the material presented and substantiated" and "not on the basis of what may be implied." Tab 19 at AR 1469.

Based on the information in the proposals, NASA Ames reasonably determined that STC's proposed Cost/Price figures were too low. NASA applied upward cost adjustments to both AMA's and STC's forecasted costs. Tab 24 at AR 2218. Its changes to STC's figures were more significant because, unlike AMA, STC's calculations were missing critical information for several of its figures. *Compare* 22d at AR 2106–10 (providing factors impacting STC's indirect rate projections) *with* Tab 21d at AR 1787–93 (explaining factors impacting AMA's indirect rate projections). STC recognized that the RFP required actual rates for the three prior years (2019, 2020, and 2021). Tab 22d at AR 2106. And it appreciated the need to explain its reliance on forecasted 2022 and 2023 provisional direct rates. *Id.*

STC understood the RFP required it to "disclose *the basis* of all projections, rates, percentages, and factors in enough detail to facilitate the [SEB's] understanding and to mathematically verify the results of these estimating tools." Pl.'s Reply at 6 (quoting Tab 19 at AR 1458). Plaintiff interpreted this to mean that "[t]he RFP did not require . . . particular documentation." *Id.* But Defendant reasonably concluded that the Solicitation did require these estimates to mathematically verify STC's numbers.

Given the Agency's rational reading of the Solicitation, its decision to increase STC's forecasted cost and price figures was not arbitrary and capricious. Defendant explicitly states that many of its adjustments to STC's costs were made because the Corporation failed to provide information or documentation to support its forecasts. *See, e.g.*, Tab 24 at AR 2227. AMA provided this information. *See* Tab 21d at AR 1787–93 (offering NASA tables of various forecasted rates for 2022 through 2025 as well as actual historical rates from 2019 through 2021).

STC did not provide NASA Ames with enough information to adequately evaluate the Corporation's proposal. This mistake left Defendant few options to assess the accuracy of Plaintiff's proposed costs—and whether STC's proposed costs were too low. Even if NASA Ames could have accessed these figures through DCAA, it was STC's burden to provide these numbers in its proposal. *Software Eng'g Servs., Corp. v. United States*, 85 Fed. Cl. 547, 554 (2009) (quoting *United Enter. & Assocs. v. United States*, 70 Fed. Cl. 1, 26 (2006)) ("Offerors carry the burden of presenting 'an adequately written proposal, and an offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably.'"). The Solicitation was clear: offerors needed to explain in detail their price estimating techniques as well as the underlying information they used to reach these figures. Tab 19 at AR 1457–58. And this information needed to be in the proposal. *Id.*

NASA Ames has demonstrated that "it considered the information available and did not make 'irrational assumptions or critical miscalculations.'" *Dellew Corp. v. United States*, 128 Fed. Cl. 187, 194 (2016) (citation omitted). As it noted in the RFP, it compared STC's proposed costs and prices to the historical data included in the proposal. As Plaintiff acknowledges, NASA considered the historical averages included in STC's proposal and not estimated rates from 2022 and 2023 that were excluded. *See* Pl.'s Mot. at 9–16. Thus, the Agency's upward probable cost adjustments were reasonable.

### B.    The Court Will Not Consider Plaintiff's New Explanations.

Plaintiff now provides new explanations for several of its cost forecasts. The total for "Taxes, State income, & Franchise" costs was purportedly lower due to changes in who pays pass-through taxes. *Id.* at 10 (acknowledging that STC's proposal did not contain "this particular explanation"). Its proposed pool cost for sector allocation was "directly in line with the pool costs approved by DCAA for 2023." *Id.* A clerical error in the payroll additives and fringe benefits in the historical costs that STC reported to Defendant caused inaccuracies in the Corporation's estimated costs in that category. *Id.* at 15. Plaintiff claims this flawed low figure led to Defendant's upward adjustment. *Id. See also* Tab 44a at AR 3217 (explaining that while the Agency is now aware STC made a clerical error in the historical data it provided, "STC did not provide this explanation in its proposal"). Plaintiff also asserts NASA Ames was "irrational and mistaken" when it assumed travel costs would increase to pre-pandemic levels. Pl.'s Mot. at 14–15. STC argues "it is universally known that remote meetings via Zoom, MS Teams, or similar applications are much more popular than before the pandemic, negating the need for business travel." *Id.* at 15.

STC did not provide any of this information in its proposal. These are new explanations that justify how Plaintiff generated the information in its offer. This Court must review NASA's decision making based on the administrative record. *Day & Zimmerman Servs.*, 38 Fed. Cl. at 597 ("[T]he court's review of agency action is, as a general rule, limited to the administrative record.")  "[S]upplementation of the record should be limited to cases in which the omission of the extra-record evidence precludes effective judicial review." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009) (citation omitted). "The purpose of limiting review

to the record actually before the agency is to guard against courts using new evidence to convert the arbitrary and capricious standard into effectively de novo review." *Ace-Fed. Reps., Inc. v. United States*, 150 Fed. Cl. 94, 106 (2020) (citation omitted). The Court cannot consider STC's new explanations because they were not provided to NASA when it evaluated Plaintiff's proposal.

### C.    Discussion and Clarification

#### 1.    Defendant Did Not Need to Engage in Discussions.

Plaintiff further argues that NASA erred by failing to engage in discussions or seek clarifications. Yet STC does not dispute that agencies generally maintain discretion as to whether to hold discussions. Pl.'s Reply at 2. *See also* FAR 15.306. And here, the Solicitation specifically stated that the Agency did not intend to engage in discussions. Tab 19 at AR 1468. "The general rule is that once offerors are warned that the agency intends to award without discussions, absent special circumstances, the contracting officer has the discretion to award without discussions." *Chenega Healthcare Servs., LLC v. United States,* 138 Fed. Cl. 644, 653 (2018); *JWK Int'l Corp. v. United States*, 279 F.3d 985, 988 (Fed. Cir. 2002) (explaining "absent bad faith or an abuse of discretion," the evaluators "need not discuss areas in which a proposal may merely be improved").

This discretion is not limitless. Even if a solicitation states that discussions are not required, "there may be some circumstances in which the government's failure to hold discussions would be arbitrary and capricious." *Essex Electro Eng'rs, Inc. v. United States*, 458 F.App'x 903 (Fed. Cir. 2011); *Day & Zimmerman Servs.*, 38 Fed. Cl. at 604 (holding that in some "peculiar circumstances" an agency's decision not to hold discussions could be irrational). These circumstances include irregularities in the administrative record or undisclosed evaluation criteria. *Id.; Rig Masters, Inc. v. United States*, 70 Fed. Cl. 413, 422 (2006).

Plaintiff suggests that the "nature and magnitude" of the Agency's cost adjustments mandated discussions. Pl.'s Reply at 5. Had NASA Ames discussed its concerns about STC's price, the Corporation "would have provided the extensive financial backup documentation for its DCAA rates." *Id.* at 4. And, according to STC, the failure to hold discussions "unreasonably skewed the procurement in favor of AMA and caused the Agency to fail to recognize which offeror presented the best value." *Id.* at 5. Plaintiff's supposition is mistaken.

The Solicitation stated that the Agency did not plan to hold discussions. Tab 19 at AR 1468. It also instructed potential offerors to explain their cost estimates and provide documentation and support that would allow the Agency to evaluate those calculations. *Id.* at AR 1458. For many of its forecasted costs, STC did not do this. STC's omission of critical evaluation data does not constitute the special circumstances that transform an agency's decision not to hold discussions into an arbitrary choice. *See Rig Masters*, 70 Fed. Cl. at 421. NASA Ames was not obligated to conduct discussions, and Plaintiff may not now "revise deficiencies in its proposal in light of [Defendant's] unambiguous warnings." *Id.*

### 2.    The Agency Rationally Chose Not to Seek Clarifications.

"Clarifications are limited exchanges, between the Government and Offerors."  FAR
15.306(a)(1).  When an award is made without conducting discussions, "offerors *may* be given
the opportunity to clarify certain aspects of proposals."  FAR 15.306(a)(2) (emphasis added).
Agencies may choose to use clarifications to expound upon unclear elements of a proposal or to
resolve clerical errors.  *Id.*  Agencies have discretion over whether to seek clarifications.
*Mission1st Grp.*, 144 Fed. Cl. at 216.

Clarifications "are not to be used to cure proposal deficiencies or material omissions,
materially alter the technical or cost elements of the proposal, or otherwise revise the proposal."
*Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 998 (Fed. Cir. 2018) (quotation omitted).  "It
is therefore always reasonable for a [contract evaluator] not to request clarifications of a proposal
that is materially deficient."  *Mission1st Grp.*, 144 Fed. Cl. at 216 (holding that it was reasonable
for a reviewing agency to decline to hold discussions about a violative proposal).

Here, STC did not comply with the Solicitation requirements.  The Agency warned
potential offerors that they needed to "explain in detail all pricing and estimating techniques" in
their proposals.  Tab 19 at AR 1457.  That included disclosure of both the basis of all its
projections and the "rates, ratios, percentages, and factors in enough detail to facilitate [the
Agency's] understanding and ability to mathematically verify the results of these estimating
tools."  *Id.* at AR 1458.  Defendant instructed AMA and STC that their proposals would be
evaluated based on "the material presented and substantiated in the proposal[s] and not on the
basis of what may be implied."  *Id.* at 1469.

STC violated every one of these instructions.  Chiefly, it did not provide Defendant with
its proposed 2022 numbers upon which it based much of its forecasted rates.  Defendant did not
need to seek clarifications to cure the information deficiencies in STC's proposal.

### D.    Mission Suitability Evaluation

Plaintiff claims that NASA Ames unreasonably and irrationally assigned four weaknesses
to STC's proposal under Mission Suitability.  Pl.'s Mot. at 19–21.  When reviewing an agency's
action, the test is whether "the contracting agency provided a coherent and reasonable
explanation of its exercise of discretion."  *Impresa Construzioni Geom. Domenico Garufi v.
United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (quotation omitted).

### 1.    Plaintiff Erroneously Conflates the Agency's References to
Management.

STC contends that the agency erred by assigning a weakness under the management
approach subfactor for failing to demonstrate sufficient records management capabilities.  Pl.'s
Mot. at 19–20; Tab 25 at AR 2306 (assigning weakness); Tab 37 at AR 2604 (STC's debriefing).
But the Agency determined that this was a weakness in STC's proposal because "there [was] no
description of the coordination of all entities/personnel to perform the Records Management
requirements . . . .  The Offeror did not adequately address [the PWS] requirements which would

likely lead to non-compliance with NASA and Government Regulations regarding Records Management." Tab 25 at AR 2311. STC's "lack of a proposed organization structure" coupled with its "lack of a detailed explanation of how [it would] coordinate all entities/personnel responsible for accomplishing these PWS requirements" "clearly demonstrate[d] how the Offeror will perform these programmatic and technical contractual requirements." *Id.* at AR 2312. And it would lead to "critical gaps in required contract management functions which increases the risk of unsuccessful contract performance." *Id. See also id.* at AR 2310 (listing the five PWS requirements for which STC's proposal fell short). This is a coherent and reasonable explanation.

Plaintiff also argues that the Agency was "internally inconsistent." Pl.'s Mot. at 19. It claims that the Agency "found that [Capability Maturity Model Integration] certification showed that STC has a robust records management system in place." *Id.* In fact, NASA Ames found that STC had a certified "task order management process." Tab 25 at AR 2306, 2308. This process would "decrease risks in service, product, and/or software development," and has nothing to do with the Agency's distinctly different use of records management. *Id.* at AR 2308. Defendant did not evaluate STC arbitrarily under subfactor A.

### 2.    NASA Ames followed the Solicitation When it Determined STC's Proposal Had Three Weaknesses Under the Technical Approach Subfactor.

STC also contends that the Agency erred in assigning the Corporation three weaknesses under technical approach. Pl.'s Mot. at 20–21. "[A]gency technical evaluations, in particular, should be afforded a greater deference by the reviewing courts" because technical ratings "involve discretionary determinations" that courts should not second guess. *Tech. Sys., Inc. v. United States*, No. 24-955, 2024 WL 4676205, at *6 (Fed. Cl. Oct. 31, 2024) (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)). *See also CSC Gov't Sols. LLC v. United States*, 129 Fed. Cl. 416, 434 (2016). When analyzing an agency's technical examination, reviewing courts primarily consider whether the agency followed the criteria set out in the solicitation. *Anders Constr. Inc. v. United States*, 171 Fed. Cl. 300, 309 (2024).

The RFP instructed that an offeror's answers to the sample Task Orders would "be evaluated for demonstration of its understanding of sample task order requirements, completeness, and effectiveness." Tab 19 at AR 1474. *See also id.* at AR 1448–52 (listing requirements for Sample Task Order 1 and 2). STC first contends that it should not have received a weakness in response to Sample Task Order 1. Pl.'s Mot. at 19–20. The Agency decided STC's description of proposed aerodynamic and aerothermodynamic databases was inconsistent based on its claim that it used a [***] database. Tab 25 at AR 2334–35. The evaluator explained that STC's choice to use a [***] database meant its proposed approach "contain[ed] an inconsistency that results in a lack of a clear approach to perform the [Task Order's] requirements." *Id.* at AR 2334. This demonstrated "a lack of understanding" of the requirements. *Id.* at AR 2335. NASA reasonably concluded that this reflected negatively on Plaintiff's understanding of the Task Order's technical requirements. *Id.*

19

Second, Plaintiff argues that NASA Ames should have combined the two weaknesses it received under the second Task Order, leaving Plaintiff with only one weakness for that order. Pl.'s Mot. at 21. Defendant reasonably listed these two weaknesses separately because they pertained to two different requirements in the Task Order. Tab 25 at AR 2336–38 (clarifying that STC did not adequately address the two deliverables under the Task Order). There is no basis to second guess Defendant's determinations. Defendant acted rationally in its technical evaluation of the STC proposal. STC may disagree with NASA Ames' interpretations of the Corporation's technical approach, but that does not make Defendant's determinations arbitrary or capricious. *Software Eng'g Servs.*, 85 Fed. Cl. at 554.

### E.    Past Performance Evaluation

Agencies are afforded broad discretion in evaluating past performance. *Comput. Sci. Corp. v. United States*, 51 Fed. Cl. 297, 319 (2002). When a bid protest involves performance standards, a court's deference to an agency's decision is even higher. *Overstreet Elec. Co. v. United* States, 59 Fed. Cl. 99, 117 (2003). "[The protestor] must overcome a triple whammy of deference." *Id. See also Alisud-Gesac Handling – Servisair 2 Scarl v. United States*, 161 Fed. Cl. 655, 688 (2022), *aff'd,* No. 2023-1087, 2024 WL 3452957 (Fed. Cir. 2024). A court should not substitute its judgment for the agency's. *DynCorp Int.'l*, 10 F.4th at 1311. To prevail on an unequal treatment claim, the protestor must show that its proposal received a lower rating than other offers that were "substantively indistinguishable." *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (citations omitted).

STC alleges that NASA Ames unreasonably and disparately evaluated its past performance rating for its three prior contracts. Pl.'s Mot. at 21–24. Since STC's AEMMS and AMA's ESTRAD contracts were both predecessor contracts to the ASSESS award, Plaintiff claims the Agency's unequal ratings of the two contracts was irrational. *Id.* at 21–22. Plaintiff argues the SEB and the SSA should have found STC's AEMMS award "very highly pertinent" instead of the lessor score of "highly pertinent." *Id.* at 22. *Compare* Tab 26a (rating AMA) at AR 2390 *with* Tab 26b at AR 2412 (rating STC). Plaintiff reiterated that the AEMMS contract "represents roughly 50% of the total projected value of the ASSESS procurement." Pl.'s Reply at 12–13. In its view, the ESTRAD contract covered fewer requirements than the AEMMS award, yet the ESTRAD contract received a higher ranking. Pl.'s Mot. at 24. The Corporation also alleges that Defendant erred in its assessment of STC's two other contracts. *Id.* at 24–25.

That NASA Ames evaluated AMA's ESTRAD contract more favorably than STC's AEMMS contract does not inherently indicate impermissible disparate treatment. *Taahut v. United States*, 849 F.App'x 260, 267 (Fed. Cir. 2021) (stating that a determination that one offeror's past performance was less relevant than a competitor's similar past performance did not constitute unequal treatment). NASA Ames documented its finding that the projects were substantively distinguishable based on the information provided in the Offerors' proposals.

Based on the information in the Past Performance Volume, NASA Ames found the ESTRAD contract received seventeen excellent ratings, while AEMMS received only fifteen excellent ratings. Tab 25 at AR 2350, 2356–57. The SEB and SSA could not evaluate two areas

of the AEMMS contract because they "did not have adequate knowledge of performance." *Id.* at AR 2357. These two areas still received excellent ratings despite the information gap. *Id.* The remaining PWS areas received very good rankings. *Id.* at AR 2356–57. Here, STC's and AMA's performances were treated differently because STC failed to provide the Agency with all the relevant information it needed in the past performance section—a recurring theme of STC's proposal. The Corporation's arguments about the assessment of its other two contracts suffer from the same flaws. *See* Tab 25 at AR 2350–59. NASA Ames' evaluation of STC's past performance was not arbitrary or capricious.

### F.  NASA Ames' Best Value Tradeoff Analysis Was Not Arbitrary and Capricious.

STC alleges that NASA failed to meaningfully consider price, noting that the SSA did not explain why it found the difference in price between STC's and AMA's contracts "marginal." Pl.'s Mot. at 26 (quoting Tab 33 at AR 2578). This Court accords agencies "an even greater degree of discretion when the award is determined based on the best value to the agency." *Glenn Def. Marine,* 720 F.3d at 908 (citing *E.W. Bliss Co. v. United States*, 77 F.3d at 449). FAR 15.308 requires that the SSA's decision "shall be based on a comparative assessment of proposals against all source selection criteria in the solicitation" and that the "source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs." *Thalle/Nicholson Joint Venture v. United States*, 164 Fed. Cl. 224, 235 (2023) (quoting FAR 15.308). The tradeoff process "allows the Government to accept other than the lowest priced proposal" if "the perceived benefits of the higher priced proposal shall merit the additional cost." FAR 15.101-1(c). The Court reviews NASA Ames' best value analysis to determine whether the Agency acted reasonably within its discretion. *Thalle/Nicholson*, 164 Fed. Cl. at 235.

Under the Solicitation, Cost/Price was the least important factor. Tab 19 at AR 1479. As explained above, Defendant's analysis of the Mission Suitability and Past Performance factors was well documented and explained the Agency's decision-making process. And the upward adjustments to STC's proposals were not impermissible or irrational. The SSA relied on all of this in its best value tradeoff analysis. *See* Tab 33.

In explaining its decision, the evaluator did describe the difference between the price of STC's and AMA's proposals as marginal. Tab 33 at AR 2578. But it also explained that its decision was based on the SEB's analysis of the two proposals:

> The SEB provided detailed explanation and analysis to support these adjustments[,] and I was confident in the resulting probable cost/price numbers. Ultimately, Cost/Price is the least important evaluation factor, and I found that the slightly lower probable cost of the STC proposal not to be a notable advantage to the Government.

*Id.* AMA performed better than STC on the Mission Suitability factor, and AMA's proposal was also slightly stronger on the Past Performance factor. *Id.* The SSA decided that "the substantial Mission Suitability advantages offered by the AMA proposal, combined with its Very High

Level of Confidence rating for Past Performance, with only a slightly higher probable cost, represent the best value to the Government." *Id.*

Taken together, STC did not show that its offer provided the best value to Defendant. Under the Solicitation, Plaintiff's lower ratings on Mission Suitability and Past Performance outweighed its proposal's lower cost. Plaintiff has not met its heavy burden to establish that NASA Ames was unreasonable when it concluded that the five percent cost differential on a multi-million-dollar contract was acceptable. Cost/Price was the least important factor in its decision, and AMA's proposal was substantively better. *Id.* The Administrative Record provides ample rationale for the Agency's decision to award the ASSESS contract to AMA. AMA's proposal represented the best value to the Government. *Id.* STC omitted critical information from its proposal. NASA Ames permissibly determined that AMA's proposal was better than STC's offer.

## V.    STC is Not Entitled to Injunctive Relief.

STC asks the Court to enact a permanent injunction stopping the contract award to AMA. Pl.'s Mot. at 28–30. But "injunctive relief is appropriate based on the plaintiff's success on the merits, irreparable harm to the plaintiff, the balance of hardships to the parties, and the public interest in an injunction." *Newimar S.A. v. United States*, 160 Fed. Cl. 97, 120–21 (2022), *aff'd*, No. 2022-1949, 2023 WL 8534614 (Fed. Cir. 2023). *See also PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). Because STC did not succeed on the merits, the Court denies its request for injunctive relief.

## VI.    Conclusion

For these reasons, Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 25) is **DENIED**. Defendant's and Intervenor's Cross-Motions for Judgment on the Administrative Record (ECF No. 26; ECF No. 27) are **GRANTED**. The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

 s/ Carolyn N. Lerner
CAROLYN N. LERNER
Judge